IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ANTONIO VELIZ RAMOS IV, | § § § | |
| *Plaintiff*, | § § | 5-19-CV-00897-RBF |
| vs. | § § § | |
| ANDREW M. SAUL, COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION; | § § § § § | |
| *Defendant*. | § § § | |

**ORDER**

This Order concerns Plaintiff Antonio Veliz Ramos IV's request for judicial review of the administrative denial of his application for supplemental-security income under Title XVI of the Social Security Act. This action was assigned pursuant to 28 U.S.C. § 636(b), Rule 1(h) of Appendix C to the Local Rules and the docket management order entered on October 8, 2019, in the San Antonio Division of the Western District of Texas. This Court has jurisdiction to review a final decision of the Social Security Administration, *see* 42 U.S.C. § 405(g), and authority to enter this order pursuant to 28 U.S.C. § 636(c), as both parties have consented to magistrate judge jurisdiction. *See* Dkt. Nos. 8, 11, & 12.

At issue here is whether the ALJ's assessment of Ramos's residual functional capacity is supported by substantial evidence, given that there is no medical-expert opinion addressing the well-documented, severe side effects Ramos suffers as a result of medication he takes daily to keep his cancer in remission. Under the facts presented, and after considering Ramos's Brief, Dkt. No. 13, the Brief in Support of the Commissioner's Decision, Dkt. No. 15, Ramos's Reply, Dkt. No. 16, the transcript of the administrative proceedings ("Tr."), Dkt. No. 9, the other

pleadings on file, the applicable authorities and regulatory provisions, and the entire record in this matter, the ALJ's decision is **REVERSED** and this matter is **REMANDED** to the Commissioner for further consideration, as discussed below.

## Factual and Procedural Background

Plaintiff Ramos filed his application for supplemental-security income on December 13, 2016, alleging a disability onset date of January 1, 2007. *See* Tr. 198-99. He later amended the onset date to December 13, 2016. *Id.* 34-35. Ramos alleged the following impairments render him disabled: IBS (Irritable Bowel Syndrome); GERD (Gastroesophageal Reflux Disease); myeloid leukemia; depression; and anxiety. *Id.* 73. Ramos's claim was initially denied on June 15, 2017, *id.* 72-83, and once again that year on September 21 after he requested reconsideration, *id.* 85-97. In evaluating his claim, two state-agency medical consultants determined Ramos's "depressive, bipolar, and related disorders" were severe but that his leukemia was not. *See id.* 77, 91. They each found Ramos capable of some physical exertion, with the consultant on reconsideration determining Ramos could perform "heavy/very heavy" activity without any skill-level limitation. *See id.* 82, 97. Ramos was also restricted initially to "understand[ing], remember[ing] and carry[ing] out only simple instructions, mak[ing] simple decisions, attend[ing] and concentrat[ing] for extended periods, interact[ing] adequately with co-workers and supervisors and respond[ing] appropriately to changes in routine work settings." *Id.* 81. The consultant expanded these mental limitations on reconsideration to "understand[ing], remember[ing] and carry[ing] out detailed, noncomplex instructions." *Id.* 96.

Following the denial of his benefits claim, Ramos requested and received an administrative hearing. *Id.* 13-25, 116-33. Ramos and his attorney attended the hearing on June 14, 2018, at which Ramos and vocational expert John Saenz testified. *Id.* 32-49.

In denying Ramos's claim for benefits, the ALJ applied the required five-step sequential analysis to determine whether Ramos was under a disability during the appropriate time period and within the meaning of the Social Security Act. *Id.* 13-25. At step one, the ALJ found that Ramos had not engaged in substantial gainful activity since the alleged amended onset date of December 13, 2016. *Id.* 15. At step two, the ALJ found that Ramos had the following severe impairments: (1) a history of chronic myeloid leukemia with chemotherapy and major molecular response, which in remission was accompanied by myalgia/diffuse pain/neuropathic pain/chronic pain syndrome that the ALJ determined was "stable well controlled" and (2) depressive disorder/major depressive disorder/adjustment disorder, and anxiety disorder, unspecified. *Id.* 15-16. At step three, the ALJ found that none of Ramos's impairments met or medically equaled the impairments of any of the listed impairments in the applicable Social Security regulations. *Id.* 16-17.

Before reaching step four of the analysis, the ALJ found that Ramos retained the residual functional capacity to perform sedentary work as defined by 20 C.F.R. § 416.967(a), except that he could "occasionally interact with supervisors, co-workers, and the general public and he [could] understand, remember, and carry out simple job instructions and work-related tasks." *Id.* 17. In reaching this conclusion, the ALJ afforded "great weight" to the state-agency medical consultants' findings regarding Ramos's mental condition and related limitations because "these findings are well supported by the weight of the evidence of record." *Id.* 23. The ALJ, however, gave "no weight" to their opinions regarding Ramos's physical condition and related limitations, reasoning that "evidence added to the record in conjunction with [Ramos's] hearing documents [Ramos's] chronic myeloid leukemia is a severe impairment, which restricts him to sedentary activity." *Id.*

Mentally, the ALJ also gave "great weight" to the consultative psychologist's opinion that Ramos could understand, remember, and carry out simple and complex interactions and was able to maintain effective social interaction on a consistent basis. *Id.* (citing *id.* 1209). The ALJ, however, gave "little weight" to the psychologist's opinion that Ramos struggled with focus and concentration, as well as her opinion that Ramos had a "poor prognosis" in light of the side effects of his cancer medication. *Id.* In that largely disregarded opinion, the psychologist noted that the "side effects that come with the medication and cancer treatment are dulling his quality of life and making it difficult for [Ramos] [to] function in a day to day capacity, due to his pain, nausea, and depression." *Id.* 1209. But given that Ramos's chronic myeloid leukemia was in remission and the pain he reported experiencing had allegedly stabilized, the ALJ determined—without the benefit of a medical opinion in support—that restricting Ramos to sedentary work with the aforementioned mental limitations was "reasonable." *Id*. 23.

At step four, the ALJ determined that Ramos has no past relevant work. *Id.* 24. At step five, the ALJ determined that considering Ramos's age as a younger individual, education, work experience, and residual functional capacity, as well as the testimony of the vocational expert, Ramos could perform the following jobs existing in significant numbers in the national economy: lampshade assembler (Dictionary of Occupational Titles "DOT" #739.684-094); eyeglass assembler (DOT #713.687-018); and stuffer (toys/sporting goods) (DOT #731.685-014)—all of which are classified as sedentary and unskilled. Accordingly, the ALJ determined that Ramos was not disabled and therefore not entitled to receive benefits. *Id.* 24-25.

Ramos subsequently requested review of the ALJ's finding, which the Appeals Council denied. *Id.* 1-6. Accordingly, on July 26, 2019, after exhausting all available administrative remedies, Ramos sought judicial review of the administrative determination. Dkt. No. 1.

**Analysis**

At issue is whether the ALJ reversibly erred in assessing Ramos's residual functional capacity. Ramos argues the assessment didn't sufficiently account for severe side effects of his daily cancer medication. As discussed further below, under the specific facts presented, the record lacks substantial evidence to support the ALJ's residual-functional-capacity assessment. The record contains a "vast amount" of medical evidence[1] documenting that Ramos not only experienced multiple side effects linked to his daily cancer medication but also that those side effects warranted multiple trips to the emergency room both before and after his alleged onset date. On this record, the ALJ should have, but didn't, secure a medical-expert opinion addressing and evaluating all the documented medication side effects, many of which were inter-related, variable with changes in Ramos's medication regimen, or both. Without such an opinion, the ALJ's decision—although detailed and thorough—appears ultimately to rest on the ALJ's lay opinions about the Ramos's side effects by selectively picking and interpreting certain raw medical records while ignoring or discounting others. This error prejudiced Ramos and requires remand.

    A.   *Residual Functional Capacity*. A residual-functional-capacity assessment involves a "multidimensional description of the work-related abilities" a claimant retains despite his or her medical impairments. 20 C.F.R. § Pt. 404, Subpt. P, App. 1; *see also* 20 C.F.R. § 404.1520(e); *Perez v. Barnhart*, 415 F.3d 457, 461-62 (5th Cir. 2005). As mentioned, Ramos complains that the ALJ's assessment failed to sufficiently account for significant side effects of oral chemotherapy medication taken daily to keep his cancer in remission. Those side effects include nausea, headaches, fatigue, malaise, weakness, dizziness, imbalance, memory loss,

---

[1] *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).

blurred vision, muscle aches, and bone pain. *See* Pl. Br. at 1. The persistence of the side effects, according to Ramos, has led to anxiety, depression, and panic attacks. *See id.*

The ALJ concluded, apparently in relation to the side effects alleged, that Ramos's history of treatment, clinical findings upon examination, and reported activities of daily living were inconsistent with the level of severity he alleged. Tr. 19-23. The ALJ, in short, didn't credit Ramos's reports and hearing testimony regarding the side effects he experienced, and the ALJ determined that whatever side effects Ramos had experienced didn't warrant adjusting the residual-functional-capacity assessment beyond the restriction to sedentary work, with some additional mental limitations referenced by the state agency consultants and the consultative psychologist.

The ALJ overstated matters when noting that the reported side effects weren't supported by the medical evidence because, for example: (1) medical records failed to document chronic weakness, vomiting, vision loss, shortness of breath, balancing difficulties, loss of sensation, or significant range-of-motion limitations upon routine examination; (2) examination notes revealed that Ramos's presentation upon examination failed to establish significant limitations in the ability to walk, sit, stand, move about, lift, and carry; (3) reported sleep difficulties were attributable to the fact that Ramos modified his sleep schedule to sleep during the day while staying up at night; (4) medical records failed to document any falls or fall-related injuries; (5) the record lacked any objective evidence of progressive memory loss or significant memory impairment; (6) medical records documented that Ramos's pain was stable and well-controlled with medication; (7) Ramos's headaches had reportedly improved; and (8) Ramos's use of a cane was never prescribed. *See id.* But the ALJ also recognized that Ramos suffered from depression as well as anxiety and, though stabilized, he continued to experience chronic pain. *See id.* The

ALJ ultimately determined that a restriction to the performance of sedentary work, accompanied by some mental limitations, was "reasonable." *Id.*

The determination of a residual functional capacity is the ALJ's "sole responsibility," *Taylor v. Astrue*, 706 F.3d 600, 602-03 (5th Cir. 2012), and the ALJ considers all relevant medical and other evidence in making that determination, *see* 20 C.F.R. § 404.1545(a)(3). Such an assessment should account for any limitations or restrictions caused by side effects from needed medications. *See, e.g.*, *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999) (citing regulations and stating, "the Commissioner is required to consider the type, dosage, effectiveness, and side effects of any medication the claimant takes" (quotations marks and brackets omitted)); Security Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (Jul. 2, 1996); 20 C.F.R. § 416.929(c)(3)(iv).

Moreover, it is the ALJ's duty to fully and fairly develop the record to a degree sufficient to enable sound decision-making on a claimant's residual functional capacity. *See Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996). The mere fact that a claimant was counseled at the hearing doesn't absolve the ALJ of performing that duty, including by obtaining a needed medical-source statement or questioning a claimant about his limitations and activities if such questions are warranted. *See Ripley*, 67 F.3d at 557 ("Usually, the ALJ should request a medical source statement describing the types of work that the applicant is still capable of performing."). To be clear, the absence of a medical-source statement doesn't always on its own render an ALJ's residual-function-capacity determination unsupported by substantial evidence. *See id*. In the absence of such a statement, the Court focuses on whether substantial evidence supports the ALJ's determination. *See id.*

Here, Ramos clearly must manage multiple medical challenges, some stemming from his underlying cancer and some from the medication he must take to treat it. Seeking to grasp Ramos's full medical picture, the ALJ interpreted raw medical data to decide—as a doctor might—that certain of Ramos's side effects were adequately treated or managed and that others could be effectively disregarded.[2] But an "ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position." *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).

There is no dispute that nausea, headaches, fatigue, malaise, weakness, dizziness, imbalance, memory loss, blurred vision, muscle aches, and bone pain are all side effects linked to Ramos's chemotherapy treatment. And "pain resulting from a 'medically determinable impairment,' even when its existence is unsupported by objective medical evidence, may of itself be so intense as to cause disability." *Ware v. Schweiker*, 651 F.2d 408, 412 (5th Cir. 1981).

The record reflects that Ramos's side effects were severe and persistent. Indeed, Ramos sought treatment on a number of occasions (often on an emergency basis) due to medication side effects. *See* Pl. Br. at 5-11 (summarizing Ramos's multiple complaints and treatment attempts). For example, the record reflects that Ramos repeatedly complained of and sought emergency treatment for abdominal distress and chronic nausea with associated vomiting. *See, e.g.*, Tr. 809, 1003, 2180. Just one month before his hearing with the ALJ, Ramos presented to the emergency department with these complaints. *See id.* 2166. And although Ramos's pain medication helped relieve his pain, it also apparently resulted in an increase in these other side effects, along with dyspnea (shortness of breath) and anxiety. *See id.* 830, 989. A full picture is needed—but here is missing—reflecting *all* the severe side effects (as Ramos generally suffered them as opposed to

---

[2] *See Perez v. Sec'y of Health & Human Servs.*, 958 F.2d 445, 446 (1st Cir. 1991) ("[A]n ALJ is not qualified to interpret raw medical data in functional terms.").

how they might present at various discrete points in time), with underlying medical data being interpreted and harmonized by a physician, not the ALJ.

To be fair, several treatment notes suggest that at least *some* of the many and varied chemotherapy side effects, such as Ramos's chronic pain and headaches, had "stabilized" over the years, and that Ramos had responded well to certain pain medications.[3] But although Ramos's pain might have at times been stabilized, treatment records still categorized at least some of his chemotherapy side effects as "persistent." *See, e.g.*, *id.* 1667 (noting that Ramos "continues to have multiple persistent but stable side effects" including nausea, myalgias and joint pain, blurry vision, night sweats, and headaches); *id.* 1688 (same); *id.* 1736 ("persistent myalgias and joint pain, esp. Knees"); *id.* 1976 (noting that Ramos "continues to have multiple persistent but stable side effects: nausea, myalgia and joint pain"); *id.* 2000 ("persistent severe headache"). The record also reveals that Ramos frequently used a cane, even though one was never prescribed (apparently due to a lack of insurance coverage as opposed to a lack of necessity). *See id.* 369. There is not a full record based on the treatment notes reflecting how *all* of Ramos's documented side effects could be expected to affect his ability to work, which is especially troubling here because, for example, Ramos reported that his pain medications cause additional side effects of their own. *See id.* 830, 989.

The other record evidence doesn't sufficiently fill in the gaps. To start, the state-agency consultants determined that Ramos's chronic myeloid leukemia wasn't a severe impairment. *See id.* 77, 91. And they didn't discuss Ramos's chemotherapy side effects at all; nor did they assess

---

[3] *See, e.g.*, *id.* 1607 (recognizing that Ramos suffered from diffuse myofascial pain but that he reported "good benefit from Norco"); *id.* 1677 (diffuse body pain "is now better controlled on methadone and norco"), *id.* 1724 (pain stabilized from last visit and headaches had improved), *id.* 1976 (myalgia "stable, well controlled with current pain management regimen"); *id.* 2000 (headaches decreased from daily to 3-4 times a week lasting less than two hours).

any physical limitations. In fact, the consultant on reconsideration concluded that Ramos was capable of performing heavy/very heavy work. *Id.* 97. Although the record contains an opinion from Ramos's consultative psychologist regarding his mental limitations, *id.* 1204-10, the ALJ largely disregarded the portion of her opinion regarding Ramos's ability to function on a day-to-day basis due to the pain, nausea, and depression associated with Ramos's chemotherapy treatment, *id.* 23.

Assessing the ALJ's failure to obtain a medical opinion on Ramos's functional limitations due to chemotherapy treatment is frustrated somewhat by the ALJ's failure to explore Ramos's medication side effects at the hearing. The ALJ didn't ask Ramos about his chemotherapy treatment, let alone the nature, severity, or frequency of any side effects that accompany it. Nor did the ALJ inquire into Ramos's daily routine or perceived limitations. *See Sun v. Colvin*, 793 F.3d 502, 509 (5th Cir. 2015) (noting that in determining whether an ALJ has fulfilled his duty of fully and fairly developing the facts, "the court often focuses on the ALJ's questioning of the claimant in order to determine whether the ALJ gathered the information necessary to make a disability determination"). Instead, the ALJ briefly noted that Ramos's chronic myeloid leukemia was in remission, that Ramos's irritable bowel syndrome was no longer causing issues, and that Ramos's depression screen was negative on May 14, 2018.[4] *See* Tr. 37-38. The ALJ then focused on Ramos's alleged marijuana use and the movies and videogames Ramos enjoyed. *See id.* Although such evidence is relevant to the ALJ's determination, it does not necessarily mean Ramos isn't disabled (or more functionally restricted) as a result of side effects from medication. Nor does it authorize the ALJ to stand in

---

[4] The reference in the hearing transcript to May 14, 2008 appears to be a typographical error.

the role of a doctor and independently judge symptoms and their persistence or severity in the course of rendering a residual-functional-capacity determination.

When Ramos's counsel questioned him at the hearing, he reported significant side effects and explained that he suffered daily from them. *Id.* 40. The complained-of side effects about which Ramos testified included, "a lot of vomiting, bone pain, muscle ache, loss of memory, memory loss [sic], loss of balance, side vision . . . . [and] a lot of dizziness." *Id*. He also reported that he is given nothing to address the majority of these side effects, apart from the pain, because "they said there's nothing they really can do." *Id*. 41.

Because the record documents a significant number of severe, interrelated side effects caused by Ramos's medication regimen, the ALJ—under the facts presented here—should have more fully developed the record by obtaining an opinion from a physician tasked with evaluating all the documented side effects and their fluctuations with time and adjustments to Ramos's medication regimen. Instead, the ALJ impermissibly relied on his own lay assessment of the various side effects and an incomplete record when assessing Ramos's residual functional capacity.[5] For all these reasons, the record doesn't contain substantial evidence to support the Commissioner's decision.

      B.      *Prejudice*. Reversal in this context is appropriate if a plaintiff shows prejudice as a result of the insufficiently developed record. *See Ripley*, 67 F.3d at 557. To do this, a plaintiff must show that "had the ALJ done his duty, [h]e could and would have adduced evidence that might have altered the result." *Kane v. Heckler*, 731 F.2d 1216, 1220 (5th Cir. 1984). In other

---

[5] *See, e.g.*, *Ripley*, 67 F.3d at 557 (ALJ erred in finding claimant was capable of performing sedentary work where the record revealed a four-year history of surgery, medical examinations, and complaints of pain but didn't reflect the effect of the claimant's condition on his ability to work); *Williams v. Astrue*, 355 F. App'x 828, 832 n.6 (5th Cir. 2009) (per curiam) (citing *Ripley* and noting that "an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions").

words, the Court must determine here whether a medical-expert opinion addressing all documented medication side effects might have altered the result. *See id.* Such an opinion might have altered the outcome in this case. Remand is therefore warranted.

The record reflects that Ramos must take his oral chemotherapy medicine once a day to ensure his myeloid leukemia remains in remission. Ramos reports experiencing daily nausea, vomiting, fatigue, headaches, and muscle pain. *See* Tr. 41. At the hearing, the vocational expert testified that an individual who is consistently off-task at least 15% of the workday can't maintain competitive employment. *Id.* 47-48. At the very-least, Ramos urges, his side effects would result in him being off-task at least some part of the work-day, either due to him taking unscheduled breaks for nausea, vomiting, blurry vision, or headaches, or due to his need to rest because of weakness or dizziness. Pl. Br. at 17. This is consistent with the consultative psychologist's opinion that Ramos "struggles with focus and concentration" and that Ramos's medication "ma[de] it difficult for [him] [to] function in a day to day capacity, due to his pain, nausea, and depression." Tr. 1209. This reflects that a medical opinion on this issue might have altered the outcome at the hearing.

There is no merit to the Commissioner's contentions that Ramos's protestations of prejudice are pure speculation, *see* Comm'r Br. 8-9, and that there is no showing of prejudice because Ramos "has failed to show where in the 2182-page record [ ] a physician or other medical professional identified this functional limitation, or any functional limitations greater than those included in the RFC assessment." *Id.* The test here is not whether Ramos has proven a medical opinion necessarily would result in a different residual-functional-capacity outcome. Nor is it Ramos's burden to show that his medication will result in him being off-task at least 15% of the workday. Ramos has met his burden by introducing evidence demonstrating that he

suffered from significant side effects that call into question his ability to work, and that a medical opinion assessing those documented side effects might have produced a different outcome here. It was the ALJ's duty—not Ramos's—to obtain a medical opinion under these circumstances.

  *C.* *Remand Instructions*. For the reasons discussed above, remand is appropriate. On remand, the ALJ shall obtain a report from a treating or consulting physician regarding the effects of Ramos's myeloid leukemia and chemotherapy medication on his ability to work.[6] If necessary, the ALJ shall hold another hearing and obtain new vocational expert testimony. At the hearing, the ALJ should question Ramos regarding his capabilities, limitations, and daily routine to ensure the facts are fully and fairly developed.

## Conclusion

  For the reasons discussed above, the Commissioner's decision that Ramos is not disabled is **REVERSED** and this case is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this opinion.

  **IT IS SO ORDERED**.

  SIGNED this 25th day of September, 2020.

                RICHARD B. FARRER
                UNITED STATES MAGISTRATE JUDGE

---

[6] *See Cornett v. Astrue*, 261 F. App'x 644, 649 (5th Cir. 2008) (ALJ's need to contact a medical source arises when the available evidence is inadequate to determine if there is a disability).